**WILENCHIK & BARTNESS**
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street Phoenix, Arizona 85004

Telephone: 602-606-2810   Facsimile: 602-606-2811

Dennis I. Wilenchik, #005350
David A. Timchak, #032095
Craig W. Broadbent, #029032
Fabian Zazueta, #032687
admin@wb-law.com
*Attorneys for Defendants Elizabeth Danzik,*
*Deja II, LLC, Richard Carrigan, Tony Ker, and Danzik Applied Sciences*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **CWT Canada II Limited Partnership, an Ontario, Canada Limited Partnership; and Resource Recovery Corporation, a Delaware Corporation,** | **Case Nos.: 2:16-cv-00607-DGC<br>2:16-cv-02577-GMS (Consolidated)<br>2:17-cv-00969-JAT (Consolidated)** |
| **Plaintiffs,** | **DEFENDANTS RICHARD CARRIGAN, ANTONY KER, AND DANZIK APPLIED SCIENCES, L.L.C.'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| **v.** | |
| **Kevin J. Bridges, an Arizona citizen; Jane Doe Bridges, an Arizona citizen; Richard Carrigan, a citizen of Nevada; Jane Doe Carrigan, a citizen of Nevada; and Danzik Applied Sciences, LLC, a Delaware Limited Liability Company,** | **AND** |
| **Defendants.** | **DEFENDANTS RICHARD CARRIGAN, ANTONY KER, AND ELIZABETH DANZIK'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| **And all related claims.** | **(Oral Argument Requested)** |

Defendants Antony Ker ("Ker"), Richard Carrigan ("Carrigan"), Danzik Applied Sciences, LLC ("DAS"), and Defendant/Counterclaimant Elizabeth J. Danzik ("Elizabeth") (collectively, "Defendants") hereby respond to Plaintiff CWT Canada II Limited Partnership and Resource Recovery Corporation's (collectively "CWT") Motion for Summary Judgment [Doc. 156], and submit their Cross-Motion for Partial Summary Judgment. The Response and Cross-Motion are supported by the following Memorandum of Points and Authorities, Defendants'

Controverting Statement of Facts ("CSOF"), Defendants' Separate Statement of Facts ("SSOF"), and the Declarations of Ker, Carrigan, and David Timchak, Esquire, filed concurrently herewith.

### MEMORANDUM OF POINTS AND AUTHORITIES

**A.** **Response to CWT Parties' Motion for Summary Judgment**

    **I.** **Introduction**

       CWT's motion must be denied because material disputed fact issues exist regarding the alleged liability of Carrigan and Ker for the conversion-related claim, and because the doctrines of res judicata and collateral estoppel do not apply as argued by CWT, through the concept of "privity," to establish such liability. Carrigan and Ker dispute CWT's assertion of their degree of knowledge, participation, and responsibilities regarding RDX Technologies Corporation's ("RDX") treatment of the tax credit funds, the auditor's reports, or the New York lawsuit. While Carrigan and Ker were parties to the original claims made by GEM in New York, they were never parties to the crossclaim and third-party claims by CWT after resolution of the GEM portion of that litigation. Moreover, Carrigan had severed his ties with RDX at or about the time that CWT's cross-claims in the New York lawsuit were filed against Danzik and RDX, and therefore had no participation in or "control" over it, so as to be considered in privity with the other party defendants. Nor can Ker be considered in privity, as he undertook none of the actions with respect to the New York lawsuit which resulted in the entry of default judgment, which was the concealment and non-disclosure of documents by RDX's then Chief Financial Officer and present CWT agent Candy Blazar ("Blazar"). As such, despite this claim failing as a matter of law, this Court cannot in any event grant judgment in CWT's favor as, at a minimum, disputed material fact issues surround these claims.

       It must be noted initially that CWT's motion describes a claim of conversion against Carrigan and Ker. However, the operative pleading, the Second Amended Complaint [Docket 56], does <u>not</u> allege a count of conversion against them. Rather, that pleading, in its Sixth Cause

of Action, alleges as to Carrigan and Ker the claim of aiding and abetting conversion by others. As discussed below, the levels of proof of *scienter* differ significantly between claims of conversion, on the one hand, and aiding and abetting, on the other. While a conversion may be proven with a showing of an act of mere intentional appropriation or dominion over property, proof of aiding and abetting requires evidence of knowing wrongful participation in another's recognized tortious conduct. The record does not contain uncontroverted evidence that Carrigan or Ker were consciously aware of any of the tortious actions alleged against Danzik in the New York action (because they were not consciously aware, and nor was Danzik's conduct in fact tortious), and regarding which the default judgment was entered. Without undisputed evidence of Carrigan and Ker's knowing wrongful participation in what they then understood to be the tortious conduct of others, there can be no summary judgment on the only conversion-related claim against them, the aiding and abetting claim. Further, CWT should not be permitted in their reply to posit for the first time any new evidence or authorities purportedly supporting the aiding and abetting standard, which they have failed to argue and have therefore waived.

Ker was an officer and director of RDX. CWT has alleged that Ker is liable for aiding and abetting conversion by Danzik and DAS because the RDX board approved tax credit fund payments, received an auditor's report recommending closer scrutiny of RDX transactions with Danzik and DAS, and supposedly managed the New York litigation. However, as noted below, Ker approved transactions and audit reports primarily based on advice from and reliance on other officers at RDX, including Bridges and Blazar—RDX's then CFO. Ker was never informed, never believed, and never acted with the belief that his managerial actions in these regards were tortious or in furtherance of the tortious conduct of others. His mere involvement in these activities is insufficient to conclusively establish the mental state necessary to prevail on a motion for summary judgment on the aiding and abetting claim. Regarding the conduct of the New York lawsuit, while Ker was aware of the litigation, he did not manage the case for RDX. It cannot be seriously contended that the litigation was his primary or even significant duty, as

the bulk of the work on the case was handled by Blazar and RDX's local counsel. [Affidavit of Michael Finkelstein, Esq. (RDX's then counsel) filed in the New York action, attached to the affidavit of David Timchak, Esq as Exhibit L ("From the inception of my representation, Ms. Blazar was the individual directly involved and was the RDX Parties' lead contact for me").] Ker was not a party to CWT's cross-claims in the case, and certainly never "controlled" the case. The mere fact that Ker had some tangential knowledge or involvement in the defense of those claims does not establish the degree of involvement necessary for a conclusive finding that he was in "privity" with Danzik and RDX for purposes of binding him personally to the default judgment against those parties.

The evidence presented with respect to Carrigan is even less convincing, and is certainly not dispositive of CWT's claims regarding conversion. Carrigan was an outside director of RDX, who served from mid-2012 through the third quarter of 2014. His compensation was $1,000.00 for the first few months of service, after which he went unpaid. As a member of the audit committee, his primary board function was to review and approve quarterly audit reports. He was never an officer or manager of RDX, and resided out of state. CWT's primary evidence against Carrigan regarding conversion is that, during certain of the tax funds transactions and when a report from RDX's auditors was received, he was a board member. Other witnesses – not Carrigan – have testified that, when some of the tax funds transactions occurred, Carrigan was a director and that, while he was a director, "the board" approved the transactions, and discussed auditing transactions with Danzik's company. Carrigan's testimony is that he recalls no such approvals or discussions, and did not attend all board meetings. Also, there is no evidence that Carrigan ever received a single penny of the tax funds. CWT has provided no "smoking gun" to contradict this, or to tie Carrigan to any specific decision, act, or omission. Rather, CWT's case against Carrigan rests primarily on his status as a director during that time, and the testimony of others regarding the board's actions and what Carrigan supposedly knew. Further, Carrigan was not connected with RDX when the New York case was prosecuted, was

4

not a party to it, and there is no evidence to establish that he ever participated in, let alone "controlled," the case. Indeed, the relevant claims were not filed in New York until September 22, 2014.  Carrigan was no longer a director of RDX after the third quarter of 2014.  There is no basis for a finding of privity with respect to Carrigan. Nonetheless, based on this non-existent or inconclusive evidence, CWT seeks to impose liability of $8 million, plus punitive damages, on a former short-term director who earned a few thousand dollars in his limited role. Disputed fact issues preclude a summary judgment on the aiding and abetting conversion count with respect to Carrigan.

## II.    **Material Facts**

### **Ker's Role as an Officer and Director**

Between 2008 and 2013, Ker served as chief operating officer ("CEO") of RDX. (SSOF. ¶ 1 .) As CEO, his responsibilities included, but were not limited to, daily communications with the chief financial officer ("CFO"), maintenance of market relationships with investors, and other general corporate management functions. (*Id.* ¶ 2.) In March 2013, he was appointed chairman the board of directors of RDX, a position that he maintained until May 2014. (*Id.* ¶ 3.) As chairman of the board, Ker's primary job responsibility included facilitating the relationship between RDX and CWT and CWT's Jean Noelting. (*Id.* ¶ 4.) At no time was Ker responsible for overseeing the detailed day-to-day operations of RDX. (*Id.* ¶ 5.)

Ker was also tasked with reviewing and approving RDX invoices. (*Id.* ¶ 6.) Specifically, he would discuss invoices with RDX CFO, Kevin Bridges ("Bridges"), to determine whether expenses occurred or transactions were reported properly. (*Id.* ¶ 7.) At all times, Ker relied on Bridges to ensure payment was made on all invoices from different parties and vendors. (*Id.* ¶ 8.) Throughout Ker's tenure as chairman of RDX, the board of directors regularly reviewed reports that were generated by RDX's auditors. (*Id.* ¶ 9.) It was Ker's understanding and belief that the auditor's duty and ensuing reports were meant to, and generally did, identify

transactions that merited closer review. (*Id.* ¶ 10.)   But those reports never stated, or were understood by Ker to suggest, that something illegal or improper had occurred. (*Id.*)

On or about July 29, 2014, the board received an audit report regarding a transaction between RDX and DAS. The report specifically made general reference to "related party transactions." (*Id.* ¶ 11.) Specifically, the report simply stated:

Related Party Transactions

We noted that the Company enters into various transactions with multiple related parties in the normal course of business for which there is very limited documentation of the business purpose retained. Under the terms of certain related party agreements, the board of directors my audit the source transactions; however, to date that right has not been exercised. Such transactions must be reviewed and approved by the Company's board of directors and adequate documentation retained in the Company's books and records. In addition, such transactions should be disclosed properly in the Company's consolidated financial statements. It is imperative that the board of directors increase their oversight over related party transactions.

(*Id.*)   Notably, this does not specifically reference the RDX contract with DAS. (*Id.* ¶ 12.)   After receiving this report, Ker spoke to Bridges to ensure that the transactions and monitoring were done appropriately under the agreement between RDX and DAS. (*Id.* ¶ 13.) The board did investigate, and neither the board nor the auditor found any improprieties regarding these transactions.   (*Id.* ¶ 14.)   Ker does not recall that the auditor ever filed an objection or did not sign off on the related financials. (*Id.* ¶ 15.)   Ker was one of the only people in management that was actually familiar with the work DAS did for RDX for which DAS was paid. (*Id.* ¶ 16.)   In that regard, Ker observed, as to DAS' work, the manufacturing in the facilities, the installation on-site, and the quality of work and equipment on the sites where the related equipment was installed. (*Id.* ¶ 17.)

At no time was Ker responsible for making payments to DAS, and nor was he in a position to do so, because Blazar and Bridges were, at all relevant times, responsible for remitting payment using RDX funds. (*Id.* ¶ 18.) Specifically, Ker never directed the remittance of the tax credit monies to DAS, which was done by Bridges and Blazar. (*Id.* ¶ 19.) He did, however, approve various invoices and confirmed whether payments were made on the same.

(*Id.* ¶ 20.) It was also Ker's understanding and belief that the federal tax credit funds were not required to be in a segregated account, and those monies were deposited into RDX's operational account when they were received. (*Id.* ¶ 21.)

A majority of the work involving the New York litigation, including regarding litigation strategy and participation, was done by Danzik and Blazar, together with RDX's New York counsel. (*Id.* ¶ 22.) Ker was aware of the New York lawsuit, assisted in it when asked and to the degree that he was able to, but played no substantive role in it. (*Id.* ¶ 23.) Ker's only substantial participation in the New York case was to discuss with RDX's attorneys his recollection of events that occurred. (*Id.* ¶ 24.) Ker was never named as a party to any of CWT's claims and was dismissed as a party in the New York case entirely prior to those claims ever being filed. (*Id.* ¶ 25.)

## Carrigan's Role as a Director

Carrigan served as a director of RDX from mid-2012 through the first quarter of 2014. (*Id.* ¶ 38.) He was always an outside director, was never an officer or manager of RDX, and at all relevant times resided in another state. (*Id.* ¶ 39.) Carrigan's primary function as a director was as a member of the audit committee, and to review and approve quarterly audit reports. (*Id.* ¶ 40.) He does not recall that he attended all meetings of the board of directors, and has no specific recollection of personally approving payment of any of the tax credit funds to Danzik or any of Danzik's companies. (*Id.* ¶ 41.) Carrigan never received any payments from the tax credit funds. (*Id.* ¶ 42.) During his first few months of service as a director, Carrigan was paid $1,000.00 per month, and nothing thereafter. (*Id.* ¶ 43.) When the audit report recommending closer scrutiny of transactions involving Danzik and any of his companies was provided to RDX, in late July of 2014, it was in the final quarter of Carrigan's service as a director, and Carrigan does not recall it. (*Id.* ¶ 44.) Carrigan denies that he discussed the auditor's warnings with Bridges. (*Id.*) Carrigan was not aware of, was dismissed early as a party to, and never participated in or controlled the New York lawsuit, as he left the company in the third quarter of

2014. (*Id.*) On August 28, 2014, the judge in the New York case dismissed the sole claim against Carrigan and Ker, which claim was made by a non-party to this litigation.  (*Id.* ¶ 48.)

### The New York Lawsuit and Blazar's Actions

In the New York lawsuit, the court entered a default judgment and struck the defendants' defenses based on the non-production of documents in discovery. (*Id.* ¶ 50.) It was learned thereafter that the documents in question had been hidden by RDX employee Blazar, who was then assisting CWT and who is now employed by an entity affiliated with CWT. (*Id.* ¶ 51.)  On June 14, 2018, Danzik filed in the New York case a Memorandum of Law in Support of a Motion to Vacate the Judgment, based on actions of Blazer in hiding the necessary discovery documents and information from the cross-defendants so that they could not be produced in compliance with the court's orders. (*Id.* ¶ 52.) The motion includes the following facts, which are material to this Response, in contradicting any argument that any of Carrigan or Ker's acts or omissions caused the resulting default judgment.

Blazar volunteered to head the discovery process on behalf of Danzik and RDX. ("From June 2014, and to late summer 2015, I assisted RDX with sorting, copying, and labeling a substantial amount of court discovery evidence, that was gathered, and managed by Candie Blazar…. Candie Blazar was the lead person, and she directed everyone including me on how she wanted the data organized for the file boxes.") (*Id.* ¶ 53.) Ker has stated that the responsibility of sending the discovery to New York legal counsel was Blazar's, who at the time was the CFO for RDX and had direct access to all of the discovery documents. (*Id.* ¶ 54.) Blazar has admitted that she had access to all of the documents, servers, and ESI requested, and there is no evidence to dispute that she secreted away the necessary documents and computer equipment. (*Id.* ¶ 55.) RDX and Danzik's lack of access to these materials, and inability to produce them, was the cause of the default judgment. (*Id.* ¶ 56.)

### The UPA Did Not Require RDX to Hold the Tax Credit Funds

The UPA, a copy of which is Exhibit 1 to CWT's Declaration of Kevin Bridges, Docket 158, references the tax credit funds in Section 2.3, at p. 10. That provision does not require the tax credit funds to be segregated into any particular or separate account, and, in fact, the funds never were so segregated. (*Id.* and SSOF ¶ 21.) Nor does the UPA contain any provision creating an express trust. (Exhibit 1 to CWT's Declaration of Kevin Bridges, Docket 158.)

### Certain Claims Against Elizabeth Danzik

In this lawsuit, CWT brought claims against Elizabeth Danzik for fraudulent transfer, conducted discovery on those claims, and produced an expert report regarding asset-tracing relative thereto. (CWT's Second Amended Complaint and Complaint Against Elizabeth Danzik.) CWT's Complaint against Elizabeth Danzik also includes a count seeking an equitable accounting. (Complaint Against Elizabeth Danzik.)

### III.   Argument

#### 1.   No Conversion Claim Alleged in the Second Amended Complaint

The Second Amended Complaint does not allege a conversion claim against Ker or Carrigan. The only count related to conversion is the Sixth Cause of Action, for aiding and abetting conversion. On this basis alone, the motion should be denied, since it argues for liability for Carrigan and Ker's own conversion—a claim that was never pleaded and, in any event, would be contrary to fact. Also, CWT should be barred from raising new facts or arguments in its Reply regarding proof of the elements of aiding and abetting. *Wells Fargo Bank, N.A. v. Allen*, 231 Ariz. 209, 214 n.3, 292 P.3d 195, 200 n.3 (Ct. App. 2012) (noting that "it [is] improper to introduce new evidence with [a] reply memorandum").

An actionable conversion may occur notwithstanding a person's lack of tortious intent and even if an act is undertaken in good faith. *McGregor v. McGregor,* 48 N.Y.S.3d 877, 883-4, 55 Misc.3d 586, 592-3 (2017)(conversion is the unauthorized exercise of the right of ownership over property belonging to another to the exclusion of the owner's rights; a wrongful intention

to possess the property is <u>not</u> an essential element of conversion). And, "money" can be the subject of conversion when it can be described, identified, or segregated in the manner that a specific chattel can be and when it is subject to an obligation to be returned. (*Id.*) In contrast, the elements of aiding and abetting, including with respect to another's conversion, are:  (1) the existence of an underlying tort; (2) <u>defendant's knowledge of the underlying tort</u>; and (3) that the defendant provided substantial assistance to advance the underlying tort's commission. *Bigio v. Coca-Cola Co.*, 675 F.3d 163 (2d Cir., 2012). *See also*, *Dickinson v. Igoni,* 76 A.D.3d 943, 908 N.Y.S.2d 85, 88 (2010)("New York law permits a claim for aiding and abetting conversion."); *Kirschner v. Bennett,* 648 F.Supp.2d 525, 533 (S.D.N.Y.2009)(requiring proof of "substantial assistance" in conversion context). As is clear, proof of aiding and abetting requires that the defendant be presently aware that another person is committing a tort, and the defendant then knowingly assists that tortfeasor, including, in the conversion context, by providing "substantial assistance."

CWT's motion against Carrigan and Ker presumes the lower conversion standard, which is practically a strict liability standard, *i.e.*, if a person's "intentional" act serves in any way to facilitate another person's act of dominion over property, then that person is also liable for conversion, regardless of that person's *scienter*, including an act undertaken in good faith. Here, CWT argues that Carrigan and Ker approved the movement of the disputed tax credit funds and did not undertake a deeper audit of RDX's transactions with Danzik, and are therefore themselves liable for conversion. However, whatever inferences could possibly be drawn from CWT's supporting evidence, they are not <u>conclusive</u> inferences, and have been contested by Carrigan and Ker insofar as concerns their awareness, mental state, and intentions. Under the standards of proof of aiding and abetting, and for purposes of CWT's motion, there must be <u>un-contradicted</u> evidence that, at the time of these alleged acts or omissions, Carrigan and Ker were aware that a tort was being committed, and took affirmative and tortious steps to advance and

1  facilitate the other actor's tort. The record simply does not support such conclusive inferences,

2  as there exist material disputed fact issues surrounding all of the pertinent allegations.

3      Ker was never advised that the transactions between RDX and DAS on that contract were

4  improper or tortious. The UPA does not establish an express trust or escrow for the tax credit

5  funds, and it includes an off-set provision. Ker had knowledge of DAS deliverables under the

6  contract, and therefore was justified in his belief that the contract was completely valid. Bridges

7  and Blazar were responsible for payments on the contract, and, until the fall of 2015, never

8  advised Ker of any improper or tortious aspect of the contract or those payments at any relevant

9  time. Regarding both the movement of tax credit funds and the auditor's report, Ker never had

10  information or himself acted with any tortious intent. As noted above, Ker was not a party to the

11  New York lawsuit cross-claims, and did not in any respect direct or control the company's

12  defense of that case, even if he did participate in it to a small degree. Ker was certainly not

13  responsible for the events leading to the default judgment. The aiding and abetting of conversion

14  claim requires, for purposes of CWT's motion, conclusive and undisputed evidence of Ker's

15  tortious intent and awareness, in relation to what he then understood to be the tortious conduct

16  of DAS and Danzik in regards to the consulting contract. No such conclusive evidence has been

17  provided, and CWT's evidence has, in fact, been contested.

18      Carrigan's involvement was even more attenuated, and he was never aware of any

19  tortious action of others with respect to the tax credit funds, and denies that he ever intended to

20  act tortiously himself, and therefore he could not possibly be found conclusively to have aided

21  and abetted torts committed by Danzik or DAS, for purposes of a motion for summary

22  judgment. Carrigan is entitled to have a jury consider the evidence and make its determinations

23  on the disputed facts, including on issues of credibility. CWT's case against Carrigan is,

24  essentially, that his status was that of a director at the time that some of the tax credit funds were

25  paid out, and when auditors recommended an audit of RDX's transactions with Danzik and

26  DAS. Carrigan has testified that he was never aware of any decisions to pay out the tax credit

funds, and does not recall the auditors' recommendations. CWT has no evidence that he attended any critical board meetings when the board expressly considered and/or acted on such matters. CWT's sole evidence is that other witnesses have confirmed that payments were made and approved by "the board," auditors' reports were presented to "the board," and that, at those times, Carrigan was serving as a director. But CWT has no "smoking gun" conclusively establishing Carrigan's actions, or his knowledge of the tortious conduct of others in relation to his own actions. Further, as noted above, Carrigan was separated from RDX soon after the auditors' report recommending closer scrutiny, and soon after the New York lawsuit was brought. Carrigan never participated in, much less controlled, the conduct of the lawsuit. There is no evidence whatsoever that Carrigan was involved in or even aware of any of the events leading to the default judgment. He never personally received any of the subject funds, and was only compensated a few thousand dollars for his entire service as a director.

Finally, as noted, even though the Second Amended Complaint does not allege a claim against Carrigan and Ker for conversion *per se*, they contest any allegation or suggestion that the subject tax credit funds were required to be kept in a segregated account, or ever were so segregated, which is a requirement of a conversion claim for money. Because the only provision of the UPA regarding the tax credits, Section 2.3, contained no segregation term, and because the subject funds were not so segregated, there are no "identified funds" to support a conversion claim for money. *Grgurev v. Licul*, 229 F.Supp.3d 267, 285-7 (2017)(if the allegedly converted money is incapable of being described or identified in the same manner as a specific chattel, it is not the proper subject of a conversion action), and quoting *Fiorenti v. Cent. Emergency Physicians*, 305 A.D.2d 453, 762 N.Y.S.2d 402, 403 (2003) and *Horn v. Toback*, 44 Misc.3d 42, 989 N.Y.S.2d 779, 782 (App. Term 2014)(holding that defendant was entitled to summary judgment on conversion claim because the claim "seeks merely to recover an allegedly unpaid debt, and does not seek to recover money from a discrete, identifiable fund"), and that determination often turns on whether the money alleged to have been converted was contained

in a <u>segregated fund</u> of some sort. *See, e.g.*, *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 160 A.D.2d 113, 559 N.Y.S.2d 704, 712 (1990) ("Money, specifically identifiable and <u>segregated</u>, can be the subject of a conversion action.")). *See also*, *Global View Ltd. Venture Capital v. Great Central Basin*, 288 F.Supp.2d 473, 480 (S.D.N.Y. 2003)(the conversion claim failed because the plaintiff did not specifically identify the allegedly converted funds; to state a cause of action for conversion of money, the money must be "described or identified in the same manner as a specific chattel." *9310 Third Ave. Assocs., Inc. v. Schaffer Food,* 210 A.D.2d 207, 620 N.Y.S.2d 255, 256 (App.Div. 2d Dep't 1994). In other words, the money must be "specifically identified and <u>segregated</u>." *Manufacturers Hanover Trust,* 559 N.Y.S.2d at 712. and *McBride v. KPMG Intern.*, 135 A.D.3d 576, 580, 24 N.Y.S.3d 257, 262 (2016)(investor plaintiffs failed to establish a claim for conversion, because, even if the subject money was specifically identifiable when sent to defendant, there was no indication that defendant <u>segregated</u> it when it sent the investors' money to a third-party).   CWT was, therefore, a mere unsecured creditor in relation to the subject funds, not a party that could have standing to bring a conversion-related claim with respect to the funds.

## 2.    Economic Loss Rule Bars the Conversion Claim

The conversion-related claim against Carrigan and Ker (for aiding and abetting) is a tort claim arising out of contract (the UPA), where no personal injury or property damage has been alleged.   The economic loss rule ("ELR") precludes such a claim.   *See Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc*., 223 Ariz. 320, 327, 223 P.3d 664, 671 (2010) ("The principal function of the economic loss doctrine, in our view, is to encourage private ordering of economic relationships and to uphold the expectations of the parties by limiting a plaintiff to contractual remedies for loss of the benefit of the bargain."); *see also, Cook v. Orkin Exterminating Co*., 227 Ariz. 331, 333, 258 P.3d 149, 151 (App. 2011)(dismissing tort claims due to economic loss rule).   In *Cook*, the Cooks similarly filed an "action against Orkin alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing,

breach of warranty, breach of fiduciary duty, negligence, negligent and intentional misrepresentation, and fraud." (*Id.*) Thereafter, Orkin moved for summary judgment on the grounds that the Cooks' tort claims were barred by the ELR, that Orkin owed no fiduciary duty to the Cooks, and that Orkin had not breached the Agreement." (*Id.*) Ultimately, the court ruled that the Cooks had failed to establish facts giving rise to a claim for breach of fiduciary duty and that their tort claims were barred by the ELR.   (*Id.*) The Court of Appeals affirmed and explained:

> We consider the relevant contract and tort law policies and determine the ELR applies in this case and limits the Cooks' claims to those in contract. As in Flagstaff II, the contract law policy of upholding the parties' expectations favor limiting the Cooks' claims to those in contract and, where there has been no injury besides that to the subject property, there is no strong policy reason to impose tort liability. Accordingly, we apply the ELR and hold that the Cooks are limited to their contractual remedies for purely economic loss from Orkin's alleged failure to adequately perform its promises under the Agreement. Because the Cooks are seeking remedies for purely economic loss from Orkin's alleged failure to adequately perform its promises under the Agreement, the ELR bars their tort claims.

*Id.* at 335, 258 P.3d at 153.   Because CWT alleges only economic damages arising out of its contractual relationship with Danzik and RDX, the tort claim regarding the alleged aiding and abetting of conversion is barred by the ELR.

Moreover, CWT cannot circumvent the ELR by suing corporate representatives individually.  *See Gilbert Unified Sch. Dist. No. 41 v. CrossPointe*, LLC, No. CV 11-00510-PHX-NVW, 2012 WL 1564660, at *6 (D. Ariz. May 2, 2012) ("Therefore, the economic loss doctrine bars the District's fraudulent inducement claim against Keebler because the allegedly false representations are inseparable from the essence of the contractual agreement between the District and CrossPointe, Keebler made them as CrossPointe's chief executive officer on behalf of CrossPointe, and the doctrine would bar a fraudulent inducement claim against CrossPointe on the alleged facts. The District may not circumvent the economic loss doctrine, which bars tort

recovery from CrossPointe, by asserting tort claims against its chief executive officer, who acted on behalf of CrossPointe and whose allegedly false statements were adopted by CrossPointe.")

A basic axiom of corporate law is that a corporation will be treated as a separate entity unless there is sufficient reason to disregard the corporate form. As a separate entity, the personal assets of a corporate officer or director may not normally be reached to satisfy corporate liabilities. A corporate entity will be disregarded, and the corporate veil pierced, only if there is sufficient evidence that: 1) the corporation is the alter ego or business conduit of a person, and 2) disregarding the corporation's separate legal status is necessary to prevent injustice or fraud. *Loiselle v. Cosas Mgmt. Grp.*, LLC, 224 Ariz. 207, 214, 228 P.3d 943, 950 (App. 2010).  Because CWT fails to allege that Carrigan or Ker are the alter ego of RDX, the claim regarding conversion against them is prohibited.

It is the case that, under Arizona law, an officer or director can be liable if they knowingly and intentionally cause or acquiesce in the commission of a tort. See *Dawson v. Withycombe*, 216 Ariz. 84, 101, 163 P.3d 1034, 1051 (Ariz.App. 2007)(citing *Bischofshausen, Vasbinder, and Luckie v. D.W. Jaquays Mining and Equip. Contractors Co.,* 145 Ariz. 204, 210–11, 700 P.2d 902, 908–09 (App.1985) (corporate directors can be personally liable for torts committed by a corporation or an officer by virtue of their office if they "have knowledge amounting to acquiescence...."; to be held liable a corporate director must specifically direct, actively participate in, or knowingly acquiesce in the fraud or other wrongdoing)).  However, for purposes of summary judgment, and owing to the evidence of disputed fact issues regarding Carrigan and Ker's lack of knowing and/or intentional wrongful participation in the known wrongful actions of others, any evidence of aiding and abetting conversion put forward by CWT would not conclusively establish the applicability of this exception to the ELR.

Because CWT's tort claim regarding conversion against Carrigan and Ker is barred by the ELR, CWT's motion should be denied and dismissed as a matter of law.

### 3.    Ker and Carrigan Cannot Be Found to Have Been in Privity re NY Action

Neither Carrigan nor Ker "controlled" the New York litigation, including Blazar's actions with respect to the concealed documents. Neither of them was actively or negligently responsible for the movement of the tax credit funds or the outcome of the New York litigation. As a director, Ker approved the payments involving the tax credit funds based on the advice of Bridges and Blazar, neither of whom ever advised him that there was any impropriety in doing so. Ker was aware of DAS' performance and deliverables under the subject contract. Ker was aware of the auditor's advice regarding scrutiny of related-party transactions, and consulted with Bridges on the subject, and was never warned or advised that there was any impropriety. The audit report itself does not identify an alarming, much less illegal, situation regarding the transaction. Carrigan has testified that, while a director, he has no specific recollection of approving particular transactions involving DAS and Danzik, or of the audit report. That audit report and the cross-claims in the New York case coincide with the quarter in which Carrigan left the company as a director. There is no conclusive evidence connecting any act by Carrigan to any of these events.  Therefore, there can be no conclusive finding, as to Ker or Carrigan, of privity with Danzik and/or DAS such that principles of res judicata and/or collateral estoppel bar them from contesting the aiding and abetting claim, or in asserting their defenses to the claim, including the defense of CWT's fraud in the underlying sale of the industrial facility.

### IV.    Conclusion

For the foregoing reasons, the Court should deny and dismiss CWT's motion regarding the conversion claim. Material disputed fact issues exist that preclude a ruling in CWT's favor. Because the claims arise out of the UPA, these Defendants request an award of their reasonable attorneys' fees and costs incurred in defending these counts,  pursuant to A.R.S. §§ 12-341 and 12-341.01, any applicable provisions of the contracts, and/or otherwise at law.

**B.    Defendants' Cross-Motion for Partial Summary Judgment**

**I.    Introduction**

Carrigan and Ker cross-move for summary judgment on the following of CWT's claims against them in CWT's Second Amended Complaint:

**1.    Tortious Interference: Third Cause of Action**

As a matter of law, a cause of action for tortious interference with contract cannot lie against a party to that contract, and, as here, in the case of a contracting corporate party, cannot be brought against officers or directors of that same entity. Carrigan and Ker were directors and/or officers of RDX, the contracting party, and the tortious interference count against them therefore fails to state a claim for which relief may be granted.

**2.    Breach of Trust: Fourth Cause of Action**

Because the UPA does not create an express trust, as CWT alleges, neither Carrigan nor Ker were trustees of CWT. The breach of trust count against them therefore fails to state a claim for which relief may be granted.

**3.    Breach of Fiduciary Duty: Fifth Cause of Action**

Neither Carrigan nor Ker were, as a matter of fact or law, in a fiduciary relationship with CWT with respect to the UPA. The relationship was that of arms'-length contracting parties, CWT and RDX. Neither Carrigan nor Ker were "trustees" of CWT with respect to the tax credit funds. Therefore, the breach of fiduciary duty count against them fails to state a claim for which relief may be granted.

**4.    Aiding and Abetting Breach of Fiduciary Duty and Breach of Trust: Sixth Cause of Action**

Danzik and RDX were not, as a matter of fact or law, in a fiduciary relationship with CWT with respect to the UPA, or trustees of CWT. The relationship was that of arms'-length contracting parties, CWT and RDX. The UPA does not establish an express trust with respect to the tax credit funds. Therefore, the aiding and abetting breach of fiduciary duty and breach of

trust counts against Carrigan and Ker, based on any purported fiduciary duty owed by Danzik and/or RDX, as trustees, to CWT with respect to the tax credit funds, therefore fail to state claims for which relief may be granted.

Elizabeth Danzik cross-moves for summary judgment on the following of CWT's claims against her in CWT's Complaint:

### 5. Constructive Trust: Ninth Cause of Action

A constructive trust is a remedy, not an independent cause of action. The independent constructive trust count therefore fails to state a claim for which relief may be granted.

### 6. Accounting: Tenth Cause of Action

An accounting cause of action is brought in order to determine the <u>amount</u> that another party allegedly owes. CWT's complaint alleges exact amounts sought.  This count therefore fails to state a claim for which relief may be granted.

### II. Material Facts

The Second Amended Complaint, Docket 56, asserts claims against Carrigan and Ker for tortious interference with the UPA (Third Cause of Action), breach of trust (Fourth Cause of Action), breach of fiduciary duty (Fifth Cause of Action), and aiding and abetting breach of fiduciary duty (Sixth Cause of Action).

CWT's Complaint against Elizabeth Danzik, filed March 6, 2016 in Case 2:16-cv-00607-DGC, asserts claims against her for constructive trust (Ninth Cause of Action) and accounting (Tenth Cause of Action), the latter of which alleges exact amounts sought, $1 million and $730,000.00. The Second Amended Complaint, against Carrigan, Ker, and DAS, also asserts claims for fraudulent transfer (Ninth, Tenth, and Eleventh Causes of Action), and that CWT engaged an accounting expert who analyzed all of the transactions regarding to the funds sought by CWT's from Elizabeth Danzik. (Second Amended Complaint, ¶ 26.)

Carrigan, Ker, and Elizabeth Danzik incorporate herein the Material Facts section of the Response, *supra*.

1

III.    **Argument**

2

1.      **No Basis for Tortious Interference Claim**

3      It is well-settled that a party to a contract cannot be liable for tortious interference with

4   that contract. *Wells Fargo Bank v. Arizona Laborers*, 201 Ariz. 474, 38 P.3d 12 (2002), *BioD,*

5   *LLC v. Amnio Technology, LLC*, 2015 WL 143811 (D.Ariz., 2015), *Stilwell v. City of Williams*,

6   668 Fed.Appx. 227, 229 (D.Ariz., 2016) and *Hudson v. Craven*.   403 F.3d 691 (9th Cir.,

7   2005)(under Washington law). Carrigan was a director and Ker was a director and officer of

8   RDX. CWT also alleges, although Carrigan and Ker deny, that they, as agents of RDX, were

9   also trustees of the tax credit funds by virtue of the contract's provision pertaining to the tax

10  credit funds. Regardless of any of these labels regarding their status, it is clear that they were

11  neither "strangers" to the UPA nor third-party beneficiaries of it, the only types of proper parties

12  to such a claim. Because Carrigan and Ker cannot be liable to CWT for tortious interference as a

13  matter of law, the Third Cause of Action against them must be dismissed.

14

2.      **No Basis for Breach of Trust or Aiding and Abetting Breach of Trust Claims**

15     CWT alleges that the UPA established an express trust (Second Amended Complaint

16  121), and that Carrigan, Ker, Danzik, and/or RDX are the trustees. However, Section 2.3 of the

17  UPA, concerning the payment to CWT at closing of tax credit funds, is a single-paragraph

18  provision that makes no reference whatsoever to a trust, a trustor, a trustee, or a beneficiary. It

19  also makes no reference to Carrigan, Ker, or Danzik, in any capacity. CWT is attempting to

20  transform a breach of contract claim into various torts, including this claim for breach of express

21  trust. Because there is no factual or legal basis for positing an express trust, there are no grounds

22  for CWT's assertion of a breach of trust claim or a claim for aiding and abetting a breach of

23  trust. Accordingly, these claims against Carrigan and Ker must be dismissed.

24

25

26

### 3.    No Basis for Breach of Fiduciary Duty or Aiding and Abetting Breach of Fiduciary Duty Claims

The relationship between CWT and Carrigan, Ker, Danzik, and RDX can only be characterized as contractual. As a matter of fact and law, they never had a fiduciary relationship with, or fiduciary duty to, CWT. *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 945 P.2d 317 (1996)(trust, confidence, and reliance, though necessary components, do not suffice to establish a fiduciary relationship; fiduciary relationship is distinguished from arm's length relationship, and mere trust in another's competence or integrity does not suffice to create fiduciary relationship). The relationship between the parties is nothing more than a commercial contract, and nowhere have these Defendants agreed to serve as fiduciaries for CWT, and the law does not, in these circumstances, impose such a duty.  "A commercial contract creates a fiduciary relationship only when one party agrees to serve in a fiduciary capacity."  *Urias v. PCS Health Sys.*, Inc., 211 Ariz. 81, 87, 118 P.3d 29, 35 (App. 2005).  Although the relationship between joint-venturers is fiduciary in character, and imposes on all participants an obligation of loyalty to the joint concern and of utmost good faith, fairness, and honesty with their dealings with each other with respect to matters pertaining to enterprise, see *Ghiz v. Millett*, 71 Ariz. 4, 222 P.2d 982 (1950), there is no evidence, and nor does CWT allege, that the UPA created a joint venture among and between the parties. Accordingly, the breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims must be dismissed as a matter of law.

### 4.    Constructive Trust is a Remedy Not An Independent Cause of Action

CWT's claim for constructive trust is not an independent cause of action, but, rather, is a remedy. *Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 229 Ariz. 377, 410, 276 P.3d 11, 44 (2012), *Burch & Cracchiolo, P.A., v. Albino Pugliani*, 144 Ariz. 281, 285, 697 P.2d 674, 678 (1985)("A constructive trust is an equitable remedial device, generally used to prevent unjust enrichment."), and *Murphy Farrell Dev., LLLP v. Sourant*, 229 Ariz. 124, 130, 272 P.3d 355, 361 (Ct. App. 2012)(noting that constructive trust is an equitable remedy tied to unjust

1   enrichment). This count against Elizabeth Danzik therefore fails to state an independent claim

2   upon which relief can be granted, and must be dismissed.

3   **5.**   **Accounting Claim Against Elizabeth Danzik**

4   The accounting claim must be dismissed because the purpose of such a claim is for a

5   party to determine the <u>amount</u> that another party allegedly owes. In the Second Amended

6   Complaint, at ¶ 26, CWT alleges that they engaged a forensic accounting expert, who has traced

7   $1 million of the tax credit funds to Elizabeth Danzik. The Complaint against Elizabeth Danzik

8   alleges that she must return $1 million paid to her company regarding a stock purchase

9   transaction, and that, according to CWT's forensic accounting analysis, $730,000.00 of the tax

10  credit funds are attributable to Elizabeth Danzik as her share of community property in relation

11  to the use and payoff of one of Danzik's credit cards. CWT therefore has already quantified its

12  claim against her. CWT's accounting claim against her alleges that CWT has no adequate

13  remedy at law, and therefore the claim is in fact one for an equitable accounting. Nowhere has

14  CWT alleged a partnership relationship with Elizabeth Danzik, so there is no partnership basis

15  for seeking an accounting. *Estate of Kirschenbaum v. Kirschenbaum*, 164 Ariz. 435, 793 P.2d

16  1102 (1989)(a cause of action for an accounting may exist in a partnership context).

17  An "equitable accounting" is a distinct remedial cause of action, rooted in equity, which

18  seeks an adjustment of the accounts of the parties and a rendering of a judgment for the <u>balance</u>

19  <u>ascertained to be due</u>. *Mankert v. Elmatco Products, Inc.*, 84 Conn. App. 456, 854 A.2d 766

20  (2004); *Grgurev v. Licul*, 229 F. Supp. 3d 267 (S.D. N.Y. 2017)(applying New York law),

21  *Green Valley Landowners Association v. City of Vallejo*, 241 Cal. App. 4th 425, 194 Cal. Rptr.

22  3d 19 (1st Dist. 2015), review denied, (Jan. 13, 2016), and *Datto Inc. v. Braband*, 856 F. Supp.

23  2d 354, 375 (D. Conn. 2012)(applying Connecticut law). It may be sought through an equitable

24  proceeding that is properly ordered when there is an <u>unliquidated and unascertained amount</u>

25  owing <u>that cannot be determined</u> <u>without an examination</u> of the debits and credits on the books

26  to determine what is due and owing. *(Id.)* *EQT Production Company v. Magnum Hunter*

*Production Company*, 2017 WL 3052979 (E.D. Ky. 2017)(applying Kentucky law). An accounting is not a proceeding to which every litigant may maintain as of right and should be granted only in carefully prescribed and determined circumstances. *Heath v. Sims*, 242 Ga. App. 691, 531 S.E.2d 115 (2000), and *Ralls Corp. v. Huerfano River Wind, LLC,* 27 F. Supp. 3d 1303 (N.D. Ga. 2014) (applying Georgia law). An accounting has been described as a species of disclosure, predicated on a plaintiff's legal inability to determine <u>how much money</u>, if any, is due; the purpose of the accounting is therefore, in part, to discover what, if any, sums are owed to the plaintiff, and, in this way, an accounting may be used, in a sense, as a discovery device. *Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 92 Cal. Rptr. 3d 696 (3d Dist. 2009). In many jurisdictions, the remedy of equitable accounting is available primarily in two circumstances: when a fiduciary owes an equitable duty to account or when an account is exceedingly complicated. *United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equipment, LLC,* 813 N.W.2d 49 (Minn. 2012). Here, there is no fiduciary relationship alleged or that ever existed, and the CWT's claim is for a fixed sum, so there is no excessive complication in arriving at that sum, which is the primary purpose of an equitable accounting.

CWT has engaged a forensic accounting expert, who has analyzed the relevant data and produced a report, including in the context of CWT's fraudulent transfer claims in the Second Amended Complaint. That is, CWT has already performed its discovery and the pertinent accounting information has been disclosed. There is no basis or need for an accounting claim against Elizabeth Danzik, as all of the relief that an accounting claim could possibly have obtained has already been provided and, therefore, moot.

To state a *prima facie* case seeking an equitable accounting, a plaintiff generally is required to establish that:

> (1) a fiduciary or confidential relationship exists between the plaintiff and the party from whom an equitable accounting is sought, or that the account at issue is exceedingly complicated;
>
> (2) the plaintiff has no adequate remedy at law; and

(3) a demand for an accounting has been made.

As noted, there is no fiduciary relationship or any existing accounting complexity. Regarding the third element, to state a cause of action for equitable accounting, a claimant must sufficiently set out that she demanded an accounting and that the other party refused the demand. *Romanoff v. Romanoff*, 148 A.D.3d 614, 51 N.Y.S.3d 36 (1st Dep't 2017), *Unitel Telecard Distribution Corp. v. Nunez*, 90 A.D.3d 568, 936 N.Y.S.2d 17 (1st Dep't 2011), and *Episcopal Church in Diocese of Connecticut v. Gauss*, 302 Conn. 408, 28 A.3d 302 (2011). There is no allegation or evidence that this demand was ever made.

For all of these reasons, the accounting claim must be dismissed.

## IV.     **Conclusion**

For the foregoing reasons, the above-referenced claims must be dismissed. Because the claims arise out of the UPA and stock-purchase contract, these Defendants request an award of their reasonable attorneys' fees and costs incurred in defending these counts, pursuant to A.R.S. §§ 12-341 and 12-341.01, any applicable provisions of the contracts, and/or otherwise at law.

**DATED** this 22nd day of August, 2018.

**WILENCHIK & BARTNESS, P.C.**

*/s/Dennis I. Wilenchik, Esq.*
Dennis I. Wilenchik, Esq.
David A. Timchak, Esq.
Craig W. Broadbent, Esq.
Fabian Zazueta, Esq.
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, Arizona 85004
*Attorneys for Defendants Elizabeth Danzik,*
*Deja II, LLC, Richard Carrigan, Tony Ker, and*
*Danzik Applied Sciences*

# CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2018, the following was served on all registered parties via ECF and I emailed the attached document to the following individuals:

J. Hendrik Taylor, Esq.
Andrew Charles Pacheco, Esq.
**RYAN RAPP & UNDERWOOD, P.L.C.**
3200 N. Central Avenue, Suite 1600
Phoenix, Arizona 85012
htaylor@rrulaw.com
apacheco@rrulaw.com
*Attorneys for Plaintiffs*

Bradley J. Nash, Esq.
Jeffrey M. Eilender, Esq.
Vitali S. Rosenfeld, Esq.
Joshua Wurtzel, Esq.
**SCHLAM STONE & DOLAN, LLP**
26 Broadway, Suite 1900
New York, New York 10004
jeilender@schlamstone.com
bnash@schlamstone.com
vrosenfeld@schlamstone.com
jwurtzel@schlamstone.com
*Attorneys for Plaintiffs*

Dennis L. Hall, Esq.
**DENNIS L. HALL, ATTORNEY, PLLC**
3033 North Central, Suite 810
Phoenix, Arizona 85012
Telephone: 480.596.4045
dennis@dlhall.net
*Attorneys for Defendant Kevin J. Bridges*

Leo R Beus, Esq.
Timothy J. Paris, Esq.
**Beus Gilbert PLLC**
701 N 44th St.
Phoenix, AZ 85008
LBeus@beusgilbert.com
tparis@beusgilbert.com
*Attorneys for Danzik Applied Sciences, LLC,*
*RDX Technologies, LLC, Dennis M. Danzik,*
*Richard Carrigan, Tony Ker, Elizabeth Danzik*

*s/ Lisa Marquez*